# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: February 25, 2015

**NO. 32,525**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellant,

v.

**NIKOLOS MONTOYA, a/k/a**
**NIKOLOS SOILES, a/k/a**
**NIKOLOS SOLLES,**

      Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Robert Schwartz, District Judge**

Hector H. Balderas, Attorney General
James W. Grayson, Assistant Attorney General
Santa Fe, NM

for Appellant

Jorge A. Alvarado, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellee

**OPINION**

**GARCIA, Judge.**

{1}    A grand jury indicted Defendant Nikolos Montoya on multiple counts of criminal sexual penetration of a minor (CSPM) and related felonies. The State appeals the district court's order dismissing Defendant's charges based upon a violation of his right to a speedy trial under the United States and New Mexico Constitutions. We affirm.

**BACKGROUND**

{2}    On May 13, 2010, a grand jury indicted Defendant on multiple counts of CSPM, sexual exploitation of a child, criminal sexual communication with a child, kidnapping, aggravated battery, and bribery of a witness, stemming from Defendant's alleged relationship with two teenaged girls. He was arrested three weeks after the indictment, on June 2, 2010. At his June 14, 2010 arraignment, he pleaded not guilty to the charges and his bond was set at $100,000. On June 23, 2010, Defendant's counsel entered an appearance on his behalf, requested disclosures from the State, and asserted Defendant's right to a speedy trial.

{3}    On August 9, 2010, the State provided Defendant with its initial disclosures. On October 25, 2010, Defendant moved for a statement of facts, asserting that the indictment lacked details as to where and when the alleged crimes occurred, what

specific acts allegedly took place, and on what evidence the State intended to rely in proving each count. At the hearing on this motion, defense counsel stated that he "reviewed all of the discovery[,]" the discovery referred to "images" in the State's possession, and he asked that the State specify which images related to which counts. He also asked that the State be "explicit as to what activity or what averment applie[d] to which count." The district court granted the motion. In doing so, it recognized that the prosecutor had not yet familiarized herself with the evidence and that providing a statement of facts to Defendant, although not required by the rules, would help "things start to make sense." Two months later, the State provided a detailed statement of facts.

{4}     On December 3, 2010, after spending about six months in jail, Defendant was released on bond. Other than notices concerning two pre-trial conferences that were to take place in April 2011 and June 2011, the record shows no further activity in this case until June 2011, at which time the district court filed a notice setting the trial for November 7, 2011.

{5}     On October 25, 2011, about two weeks before the trial was scheduled to begin, Defendant moved to dismiss the case on the ground that the State had failed to respond to his requests to conduct pre-trial interviews with the victims. On November 2, 2011, five days before trial, the State moved to continue the trial because the

2

attorney who had been prosecuting the case left the district attorney's office, and the new prosecuting attorney needed more time to either consider a plea offer or schedule pre-trial interviews with the victims. Defendant amended his motion to dismiss to include copies of email communications between defense counsel and the previous prosecutor. These emails showed that:

- Defense counsel first wrote the prosecutor on October 1, 2010, over a year before he filed his motion to dismiss, asking for documents that appeared to be missing from discovery, whether any safe house interviews had been conducted, whether he could have access to any records concerning the victims' counseling, and expressing his intention to schedule pre-trial interviews with the victims once he had all of the State's discovery. The prosecutor responded the same day, reminding defense counsel, "that once [pre-trial interviews] of [Victims] are done" the policy is "that there is no plea[.]"

- Defense counsel emailed the prosecutor two a half months later on December 14, 2010, telling her that he wanted to set the pre-trial interviews "at [her] earliest convenience[,]" such as "the week after [Christmas]" or "the first week in [January 2011]." The prosecutor responded that she would not be able to set them until mid-to-late January 2011.

- On January 6, 2011, defense counsel emailed the prosecutor again telling her that he was "ready to schedule the [pre-trial interviews]" and to "let [him] know the time frame [she]'d like to schedule them[.]" The prosecutor responded, only to remind defense counsel again that "[i]f we schedule [the pre-trial interviews with the alleged victims]—there is no plea. You do know that is the policy here, correct? Is that what your intent is? Otherwise, I'd suggest we start with other witnesses and work our way to the [alleged victims]." Defense counsel replied that he did not intend to interview anyone other than the alleged victims and suggested that the prosecutor "make a plea offer first (and soon)" and "[i]f that is rejected, then we can schedule the [pre-trial interviews]."

- Six months later, on June 21, 2011, defense counsel emailed the prosecutor again. He asked if she "plan[ned] to make a plea offer[]" and if so, when he could expect it. He also told her that they "should put this [case] on the trial calendar." The prosecutor apparently did not respond.

- Two months later, on August 26, 2011, defense counsel emailed the prosecutor telling her that he was "still waiting for [her] to get back to [him] on the [pre-trial interviews]" and to "give [him] dates when the two [alleged victims] are available to be interviewed any time [during] the first half of September." The prosecutor apparently did not respond.

- A few weeks later, on September 13, 2011, defense counsel emailed the prosecutor again, noting that she had not responded to his last email and asking for possible dates on which to set the pre-trial interviews "between now and October 10 so that we can complete the [pre-trial interviews] of the two [alleged victims] in time to have them transcribed before trial which is set for November 7." The prosecutor responded that she could set pre-trial interviews with witnesses *other than the victims* during the "last week of September." (Emphasis added.) Defense counsel reminded her that he wanted to interview the alleged victims and asked again when they could schedule those interviews. The prosecutor responded once again to remind defense counsel, "You know that means, according to [the State's CACU] policy, that there will be no plea offer[]?"

{6} At a hearing on December 7, 2011, the district court denied Defendant's motion to dismiss and granted the State's motion to continue the trial. In doing so, it ordered the State to either make a plea offer or set up pre-trial interviews with the victims by the end of December 2011, so that there would be "[n]o more messing around on the State's part."

{7} The record shows no further activity in this case for seven more months, until July 9, 2012, when the district court entered a notice rescheduling the trial for

4

September 10, 2012. This new trial date was about ten months after the trial was originally scheduled and about twenty-seven months after Defendant was arrested.

{8} On July 23, 2012, seven weeks before trial, Defendant filed several pre-trial motions, including a motion to dismiss for violation of his speedy trial right. About a week later, on July 31, 2012, the State and defense counsel filed a stipulated motion and order requiring mental health providers to release one of the victim's counseling records. During a status conference on August 21, 2012, requested by the State, the prosecutor told the court that he could not attend the hearing on Defendant's pre-trial motions because another case that he was prosecuting had been rescheduled for trial on that date. Because the court could not reschedule the motions hearing to another date before the September 10, 2012, trial, it rescheduled trial for September 24, 2012, and rescheduled the motions hearing for September 13, 2012. After the hearing on the speedy trial motion, the district court granted it and dismissed the indictment. The State appeals.

**DISCUSSION**

**A.      General Principles and Standard of Review**

{9} The Sixth Amendment of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" U.S. Const. amend. VI. The New Mexico Constitution affords a similar right: "In all

5

criminal prosecutions, the accused shall have the right to . . . a speedy public trial." N.M. Const. art. II, § 14. "Though speed is an important attribute of the right," the right "does not preclude the rights of public justice"—"if either party is forced to trial without a fair opportunity for preparation, justice is sacrificed to speed." *State v. Garza*, 2009-NMSC-038, ¶ 11, 146 N.M. 499, 212 P.3d 387 (alteration, internal quotation marks, and citations omitted). We therefore analyze "the peculiar facts and circumstances of each case." *Id.*

{10} In determining whether a defendant's speedy trial right was denied, our Supreme Court has adopted the balancing test that the United States Supreme Court created in *Barker v. Wingo*, 407 U.S. 514 (1972). *Garza*, 2009-NMSC-038, ¶¶ 9, 13. Under the *Barker* framework, we weigh "the conduct of both the prosecution and the defendant" under the guidance of four factors: (1) the length of the delay, (2) the reasons for the delay, (3) the timeliness and manner in which the defendant asserted his speedy trial right, and (4) the particular prejudice that the defendant actually suffered. *Garza*, 2009-NMSC-038, ¶¶ 13, 32, 35 (internal quotation marks and citation omitted). "Each of these factors is weighed either in favor of or against the [s]tate or the defendant, and then balanced to determine if a defendant's right to a speedy trial was violated." *State v. Spearman*, 2012-NMSC-023, ¶ 17, 283 P.3d 272.

Because none of these factors is talismanic, we analyze speedy trial claims on a case-by-case basis. *State v. Palacio*, 2009-NMCA-074, ¶ 9, 146 N.M. 594, 212 P.3d 1148.

{11}     Before applying this balancing test, we first assess whether the length of the delay was "presumptively prejudicial," depending on the complexity of the case. *Spearman*, 2012-NMSC-023, ¶ 21; *Garza*, 2009-NMSC-038, ¶ 21 ("[A] 'presumptively prejudicial' length of delay is simply a triggering mechanism, requiring further inquiry into the *Barker* factors."). "A delay of trial of one year is presumptively prejudicial in simple cases, fifteen months in intermediate cases, and eighteen months in complex cases." *Spearman*, 2012-NMSC-023, ¶ 21. Because the State concedes that the length of the delay was presumptively prejudicial regardless of the level of complexity assigned to the case, we proceed to inquire into the *Barker* factors. *See Garza*, 2009-NMSC-038, ¶ 21.

{12}     In analyzing these factors, we defer to the district court's factual findings concerning each factor as long as they are supported by substantial evidence, we independently review the record to determine whether a defendant was denied his speedy trial right, and we weigh and balance the *Barker* factors de novo. *Spearman*, 2012-NMSC-023, ¶ 19; *Palacio*, 2009-NMCA-074, ¶ 9; *see State v. Collier*, 2013-NMSC-015, ¶ 41, 301 P.3d 370 (recognizing that the *Barker* factors themselves are "factually based"); *cf. State v. Bloom*, 1977-NMSC-016, ¶ 7, 90 N.M. 192, 561

P.2d 465 (stating that, in reviewing a district court's factual findings related to a motion to suppress, the appellate court determines "only whether the evidence, viewed in the light most favorable to the finding and considering the degree of proof required, substantially supports the finding" (internal quotation marks and citation omitted)).

**B.      Discussion and Weighing of the Factors**

**1.      Length of Delay**

{13}      In determining what weight to give to the length of delay, we consider the extent to which the delay stretched beyond the presumptively prejudicial period. *State v. Ochoa*, 2014-NMCA-065, ¶ 6, 327 P.3d 1102, *cert. granted*, 2014-NMCERT-006, 328 P.3d 1188. "[T]he greater the delay[,] the more heavily it will potentially weigh against the State." *Garza*, 2009-NMSC-038, ¶ 24. A delay that "scarcely crosses the bare minimum needed to trigger judicial examination of the claim" will "not weigh heavily in [a d]efendant's favor." *Id.* ¶¶ 23-24 (internal quotation marks and citation omitted); *compare State v. Steinmetz*, 2014-NMCA-070, ¶ 6, 327 P.3d 1145 (concluding that a delay of twenty-eight months beyond the presumptive threshold weighed "moderately" against the State in a case of intermediate complexity), *cert. denied* 2014-NMCERT-006, 328 P.3d 118, *with State v. Urban*, 2004-NMSC-007, ¶ 20, 135 N.M. 279, 87 P.3d 1061 (concluding that an eighteen-month delay beyond

the presumptive threshold weighed heavily against the State in a simple case), *State v. Marquez*, 2001-NMCA-062, ¶ 12, 130 N.M. 651, 29 P.3d 1052 (concluding that a nine-month delay beyond the presumptive threshold weighed heavily against the State in a simple case), *and State v. Montoya*, 2011-NMCA-074, ¶ 17, 150 N.M. 415, 259 P.3d 820 (concluding that a six-month delay beyond the presumptive threshold weighed slightly against the State in a case of intermediate complexity).

{14} The district court found that this was a case of intermediate complexity. In making this finding, it considered the fact that the victims were teenagers, as opposed to young children, thereby "diminish[ing] the difficulty of the case[.]" On appeal, the State argues that substantial evidence does not support the district court's finding that this was an intermediately complex case because the court "had very little familiarity with the facts of the . . . case and relied solely on the victims' ages, rather than the overall complexity of the case[.]" It also noted that during previous hearings on other matters, the district court had characterized the case as "serious" and "tangled." We conclude that, viewed in the light most favorable to the district court's finding, substantial evidence supports the finding that the case was of intermediate complexity. *See Bloom*, 1977-NMSC-016, ¶ 7. At the hearing in the district court, the State's sole argument in support of its position that this was a complex case was that the case involved "two alleged victims, [and] delayed disclosure [by] both of them."

9

It also stated that "intermediate . . . [was] the absolute floor for any case involving these types of charges." The fact that the district court had previously commented at other hearings that this case was "serious" and "tangled" does not detract from its ultimate finding that the case was of intermediate complexity. Nothing in the record explains why the delayed disclosure by the two teenagers complicated this case and, if it did, to what degree and why. Thus, we defer to the district court's finding that the case was one of intermediate complexity, because it was in the best position to make that determination. *See Spearman*, 2012-NMSC-023, ¶ 19; *State v. Coffin*, 1999-NMSC-038, ¶ 57, 128 N.M. 192, 991 P.2d 477; *State v. Johnson*, 2007-NMCA-107, ¶ 7, 142 N.M. 377, 165 P.3d 1153.

{15}    The parties and the district court agreed that the length of delay was twenty-seven months. This delay extends twelve months beyond the fifteen-month presumptive threshold for intermediate cases. *See Spearman*, 2012-NMSC-023, ¶ 21. We conclude that this delay is significant and that it weighs more than slightly in favor of Defendant. *See Urban*, 2004-NMSC-007, ¶ 20; *Steinmetz*, 2014-NMCA-070, ¶ 6; *Montoya*, 2011-NMCA-074, ¶ 17; *Marquez*, 2001-NMCA-062, ¶ 12. Accordingly, we weigh this factor moderately to heavily in Defendant's favor.

## 2. Reasons for Delay

{16} We assign different weight to different types of delay. *See Spearman*, 2012-NMSC-023, ¶ 25. There are three types: "(1) deliberate or intentional delay[,] (2) negligent or administrative delay[,] and (3) delay for which there is a valid reason." *Ochoa*, 2014-NMCA-065, ¶ 8. "Deliberate delay is to be weighted heavily against the government." *Id.* ¶ 9 (internal quotation marks and citation omitted). Negligent or administrative delay weighs against the state, though not heavily. *Spearman*, 2012-NMSC-023, ¶ 25. The government's failure to make witnesses available to the defense upon request constitutes "bureaucratic indifference" that "weighs against the [s]tate." *State v. Moreno*, 2010-NMCA-044, ¶ 29, 148 N.M. 253, 233 P.3d 782 (alterations, internal quotation marks, and citation omitted); *see also Johnson*, 2007-NMCA-107, ¶¶ 12-15 (weighing the entire first twelve months of delay against the state where "the [s]tate failed to make its witnesses available for pretrial interviews so that [the d]efendant could prepare for trial"); *State v. Talamante*, 2003-NMCA-135, ¶¶ 12-13, 134 N.M. 539, 80 P.3d 476 (weighing the reasons for the delay against the state because "[t]he [s]tate's delay in producing its witnesses for defense interviews was unreasonable and cannot be condoned"). Furthermore, delay that results from lack of diligence on the part of the state weighs more heavily than do " '[i]nstitutional delays' that are inherent in the criminal justice

11

system." *State v. MacGregor*, 2013 MT 297, ¶ 33, 372 Mont. 142, 311 P.3d 428 (weighing delays attributable to the state's lack of diligence "significantly against the [s]tate").

{17} The district court found that the State was "responsible for the entire delay although there was no bad faith on its part[,]" and it weighed this factor in Defendant's favor. The State argues on appeal that the reasons for the delay should not be weighed against the State because much of the delay was "customary," Defendant delayed the proceedings when he unnecessarily moved for a statement of facts, the State was not obligated to make a plea offer or to make witnesses available without a court order, and Defendant further delayed trial in his efforts to obtain the victims' counseling records. We are not persuaded by the State's argument for several reasons.

{18} First, a twenty-seven-month delay in the prosecution of an intermediately complex case is not customary; to the contrary, any delay beyond fifteen months in such a case is presumptively prejudicial. *See Spearman*, 2012-NMSC-023, ¶ 21.

{19} Second, the district court granted the motion for a statement of facts in order to move the case forward—it recognized that seven months after the indictment the prosecutor had not yet familiarized herself with the evidence and that preparing a statement of facts would help "things start to make sense."

{20} Third, the State—not Defendant—moved to continue the trial from its original November 2011 setting because it had not yet made the victims available for pre-trial interviews despite Defendant's numerous requests to interview the victims over the course of fourteen months. It is clear from the emails between the prosecutor and defense counsel that Defendant intended to move the case forward for trial and the prosecutor resisted—the prosecutor repeatedly tried to dissuade defense counsel from conducting witness interviews by insinuating that a plea offer would be forthcoming and that conducting interviews would eliminate the chance of that plea offer under its "CACU policy." The district court's order continuing the trial and ordering the State to make witnesses available to the defense by the end of December 2011 was another effort on the court's part to move the case forward in specific response to the State's failure to do so. We are not persuaded by the State's assertion that our Supreme Court's decision in *State v. Harper* precludes us from considering the State's failure to make witnesses available for defense interviews in a speedy trial analysis. *See* 2011-NMSC-044, ¶ 21, 150 N.M. 745, 266 P.3d 25 (reversing the district court's "severe sanction" of excluding the State's primary witnesses because the State did not make them available for defense interviews by the deadline imposed by the district court).

{21}     Fourth, the record does not support the State's explanation on appeal of why trial was delayed an additional nine months after the pre-trial interviews were finished. The State argues that, because it was helping Defendant obtain the victims' counseling records, requesting a trial setting before getting these records would have been "futile[.]" In support of this argument, the State cites to a comment that the district court made during a previous hearing that "the trial setting is somewhat contingent on [defense counsel's] ability to . . . defend [his] client." Although the parties' joint efforts to obtain the victims' counseling records could have been a cause for some delay, we do not know whether any of this delay can be attributed to Defendant because the State made no record of it. Therefore, we reject the factual basis for this argument as it is purely speculative. *See State v. Ortega*, 2014-NMSC-017, ¶¶ 57, 59, 327 P.3d 1076 (declining to address arguments that are speculative and unsupported by the record). "[I]t is ultimately the State's responsibility to bring a defendant to trial in a timely manner." *State v. Stock*, 2006-NMCA-140, ¶ 17, 140 N.M. 676, 147 P.3d 885. "A defendant has no duty to bring himself to trial[.]" *Barker*, 407 U.S. at 527. Thus, we defer to the district court's finding that the State was entirely responsible for the delay in this case. *See Spearman*, 2012-NMSC-023, ¶ 19. We further conclude that the State's failure to timely schedule witness interviews despite defense counsel's persistent efforts to otherwise move the case forward on its

14

own accord without judicial intervention constitutes "unacceptable . . . indifference" to its duty to bring Defendant to trial in a timely manner. *Moreno*, 2010-NMCA-044, ¶ 29; *see MacGregor*, 2013 MT 297, ¶ 33 (recognizing that delays arising from the state's lack of diligence are weighed significantly against the state). The assertion of a "CACU policy" regarding witness interviews being delayed because the State had not yet considered making a plea offer to a defendant is not good cause for delaying trial and shall be held against the State in weighing the reasons for delaying a trial in a speedy trial analysis. *See generally Myers v. State*, 145 So. 3d 1143, ¶¶ 22-23 (Miss. 2014) (recognizing that where the length of delay is presumptively prejudicial the state "bears the burden of proving good cause for a speedy trial delay, and thus bears the risk of non-persuasion" (internal quotation marks and citation omitted)). Therefore, we also weigh this factor moderately to heavily against the State.

**3.    Assertion of the Right**

{22}    In determining the weight to assign a defendant's assertion of his speedy trial right, we "assess the timing of the defendant's assertion and the manner in which the right was asserted." *Garza*, 2009-NMSC-038, ¶ 32. We consider "whether a defendant was denied needed access to speedy trial over his objection or whether the issue was raised on appeal as [an] afterthought." *Id.* The effect of a defendant's

15

assertion of his speedy trial right may be diluted where his own actions caused the delay. *Id.*

{23} The district court found that Defendant asserted his speedy trial right three times: first, at the same time that his counsel entered an appearance on his behalf; second, when he filed his first motion to dismiss on the grounds that the State failed to schedule pre-trial interviews; and third, when he filed his specific speedy trial motion. The State argues that these assertions "weigh only slightly in Defendant's favor" because the first was "simply pro forma language in an entry of appearance less than a month after Defendant's arrest"; the second was not an explicit assertion of his speedy trial right, but rather a motion to dismiss for discovery violations; and the third—his motion to dismiss for violation of his speedy trial right—was made less than two months before trial was set to begin.

{24} Mindful of Justice Daniels' special concurrence in *Spearman*, we agree with the State that these three combined assertions should weigh less heavily in Defendant's favor. *See* 2012-NMSC-023, ¶ 46 (Daniels, J., specially concurring) (suggesting that cases should not be dismissed on speedy trial grounds without putting the State on notice that it "had to put up or suffer the consequences"). However, we are also mindful that Defendant was in custody facing a $100,000 bond and serious charges that carried the potential penalty of decades in prison and the

16

permanent stigma of sex offender registration. Although our Supreme Court has stated that a defendant's assertion of his speedy trial right that "[comes] as part of the pro forma pre[-]trial motions [the d]efendant's counsel file[s] upon entering his appearance [is] generally afforded relatively little weight[,]" *See Urban*, 2004-NMSC-007, ¶ 16, we do not consider Defendant's initial request for a speedy trial to be insignificant in light of the overall circumstances in this case. We also consider Defendant's persistence over the course of fourteen months to proceed to trial by seeking to ensure that the State had made all required disclosures and his attempts to obtain pre-trial interviews with the victims in time for the original trial setting. This behavior on Defendant's part was consistent with his first request to move the case to a timely trial and enhanced his original assertions for a speedy trial, unlike other cases in which a defendant's dilatory behavior negates the effect of his verbal or other early assertions. *See Garza*, 2009-NMSC-038, ¶ 32 (considering actions taken by the defendant in pursuing or delaying trial in addition to his verbal assertions of his speedy trial right); *see also State v. Charlie*, 2010 MT 195, ¶ 54, 357 Mont. 355, 239 P.3d 934 (considering the defendant's "responses to the delay[,]" including "timeliness, persistence[,] and sincerity of any objection to the delay," in recognizing that "[c]onduct evidencing a desire to be brought to trial promptly weighs in the defendant's favor" (alteration, internal quotation marks, and citations omitted)).

17

Given Defendant's assertions, his persistent efforts to prepare his defense for a timely trial, and the district court's several admonishments to the State regarding its failure to move the case forward, we conclude that the State was on clear notice of the need to timely fulfill its obligations to the defense, including providing access to witnesses and timely proceeding to trial in this case. Accordingly, we weigh the assertion factor slightly to moderately in Defendant's favor.

**4. Prejudice**

{25} The "heart" of the speedy trial right "is preventing prejudice to the accused." *Garza*, 2009-NMSC-038, ¶ 12. We analyze prejudice under three interests: (1) preventing oppressive pre-trial incarceration, (2) minimizing anxiety and concern of the accused, and (3) limiting the possibility that the defense will be impaired. *Id.* ¶ 35. We are mindful that "some degree of . . . anxiety is inherent for every defendant . . . awaiting trial." *State v. Maddox*, 2008-NMSC-062, ¶ 33, 145 N.M. 242, 195 P.3d 1254 (alterations, internal quotation marks, and citation omitted), *abrogated on other grounds by Garza*, 2009-NMSC-038, ¶¶ 47-48. "Therefore, we weigh this factor in the defendant's favor only where . . . the anxiety suffered is undue." *Garza*, 2009-NMSC-038, ¶ 35. A defendant is not required to show that he experienced "greater anxiety and concern than that attending most criminal prosecutions." *Salandre v. State*, 1991-NMSC-016, ¶ 32, 111 N.M. 422, 806 P.2d 562, *holding modified on*

*other grounds by Garza*, 2009-NMSC-038. "The operative question is whether the anxiety and concern, once proved, has continued for an unacceptably long period." *Id.* "It is for the court to determine whether the emotional trauma suffered by the accused is substantial and to incorporate that factor into the balancing calculus." *Id.* The evidence must also establish that the alleged prejudice occurred as a result of the delay in trial beyond the presumptively prejudicial threshold as opposed to the earlier prejudice arising from the original indictment. *Spearman*, 2012-NMSC-023, ¶ 39. Because the presumption of prejudice intensifies the longer that the delay extends beyond the presumptive threshold, less proof of prejudice is required from Defendant, and more proof of lack of prejudice is required from the State where the delay is significant. *See Doggett v. United States*, 505 U.S. 647, 652 (2012) ("[T]he presumption that pre[-]trial delay has prejudiced the accused intensifies over time."); *State v. Redlich*, 2014 MT 55, ¶ 52, 347 Mont. 135, 321 P.3d 82 (noting that, because a delay of 285 days beyond the presumptive threshold was significant, the court "require[d] less proof of prejudice from the defendant, and a greater showing of lack of prejudice from the State").

{26}     At the hearing on the speedy trial motion, Defendant's mother testified that during the time that the charges were pending, Defendant was "paranoid[,]" "extremely depressed[,] . . . lost almost 30 pounds[,]" had not "been able to go to

19

church every Sunday, like he used to," had become "constantly confused[,]" and had become "distanced" from his daughter and his son. Defendant testified on direct examination that after spending six months in jail and being released, he had problems finding employment as a plumber because he "lost all [his] equipment, all [his] tools," he was "kicked out" of the union because he "couldn't pay [his] dues" while he was in jail, and that other independent plumbing companies would not hire him because he had previously been in the union. He testified that before he was arrested, he was "extremely close" with his daughter. After the arrest, his daughter moved out of his home and he only had limited contact with her. He said that since the charges had been pending, he isolated himself because he was "very paranoid" that others would "misconstrue" his words and bring "false accusations" upon him; he had become depressed and began receiving treatment and taking medications for his depression; he stopped being affectionate toward his daughter; and he had not seen his son in over two years.

{27} On cross-examination, Defendant admitted that he would be reinstated into the union if he paid his back dues. When the prosecutor asked him if he had sought other types of employment, Defendant testified that he "was a tattoo artist at one time," but that "nobody [was] hiring" because of "all this on [his] record[.]" He said that he "did have a job" with a landscaping company for a few months about a year before the

hearing. On redirect, Defendant testified that the police "confiscated" all of his tattoo equipment prior to his arrest, and he had not gotten it back.

{28}   The district court found that Defendant "was prejudiced by the delay" in that he "suffered from depression as a result of these charges pending against him"; "[t]he depression [had] caused Defendant to be prejudiced within the meaning of *Barker* and *Spearman*"; and he was unable "to be licensed as a tattoo artist while this case was pending." It also found that "this prejudice was originally caused by the charges pending against . . . Defendant, [but] that the prejudice was [exacerbated] by excessive pre[-]trial delay."

{29}   We agree with the State that the record does not support the district court's finding that Defendant was unable to be licensed as a tattoo artist while the case was pending. Defendant testified that he "was a tattoo artist at one time," but he also testified that at the time of his arrest he had been a union plumber with the intention of taking over the family plumbing business. The record shows that he gave permission to the police to confiscate his tattoo equipment before he was arrested, but it does not show that he expressed any desire to have that equipment returned until he filed a motion to recover it *after* the district court dismissed the case on speedy trial grounds. He testified at the hearing on the speedy trial motion that his tattoo equipment had not been returned, but nothing in the hearing transcript or the record

21

indicates that he was unable to be licensed as a tattoo artist because of the pending charges or was otherwise prejudiced by the fact that the police had confiscated his tattoo equipment.

{30} Additionally, the district court did not make any findings about Defendant's inability to work as a plumber while the indictment was pending. Our independent review of the record, *see Palacio*, 2009-NMCA-074, ¶ 9, reveals that the prejudice Defendant suffered with respect to employment occurred during the first six months after his indictment and while he was in jail when his union membership was revoked for failure to pay dues. The subsequent delay in trial had no effect on his union status because Defendant's membership in the union was dependent on repaying his dues, not on being tried or acquitted of the charges. Further, because Defendant did not say how he lost his plumbing tools and equipment, we cannot determine whether they were lost as a result of the pending charges. Although Defendant was unable to obtain employment as a plumber during the twenty-seven months after his indictment, we do not weight that hardship as a significant factor in our analysis.

{32} However, we defer to the district court's findings that Defendant suffered other types of prejudice from the delay and conclude that these findings are supported by substantial evidence in the record. *See Spearman*, 2012-NMSC-023, ¶ 19; *cf. Bloom*, 1977-NMSC-016, ¶ 7 (reserving the resolution of conflicts in the evidence to the

22

district court). We further conclude that this prejudice was "actual," "particularized," and that it may be considered "undue" because it "continued for an unacceptably long period." *Garza*, 2009-NMSC-038, ¶¶ 13, 35; *Salandre*, 1991-NMSC-016, ¶ 32. Defendant and his mother testified that Defendant had become depressed, paranoid, and isolated; that his participation in his church and his relationship with his children deteriorated; that he lost about thirty pounds due to the anxiety of the pending charges. The State did not present evidence, nor did it demonstrate during cross-examination of Defendant and his mother, that Defendant did not suffer these types of prejudice.

{33}     We recognize that various aspects of the harm Defendant suffered initially resulted from having been indicted on these charges in the first place. However, we conclude that this initial harm was unnecessarily prolonged by the State's failure over the course of fourteen months to make its witnesses available to the defense and to otherwise move this case forward to a timely trial. The personal hardship and anxiety type of prejudice to be protected against is separate and distinct from the loss of liberty caused by incarceration or the possible prejudice to an accused's defense. *See Spearman*, 2012-NMSC-023, ¶ 37; *see also Salandre*, 1991-NMSC-016, ¶ 18 (stating that the speedy trial right "protects against interference with a defendant's liberty, disruption of employment, curtailment of associations, subjection to obloquy, and

23

creation of undue anxiety"); *State v. Vigil-Giron*, 2014-NMCA-069, ¶ 56, 327 P.3d 1129 (stating that "anxiety, loss of employment, continued inability to find work, and . . . public humiliation" suffered by the defendant "are forms of prejudice that the speedy trial right is intended to curtail"), *cert. denied*, 2014-NMCERT-006, 328 P.3d 1188. We also consider how Defendant's incarceration for the first six months after being indicted intensified the overall hardship and anxiety he suffered due to the subsequent delay in moving forward to a timely trial. Defendant testified that his incarceration "was the worst experience in [his] life" and that while he was in jail he "entertain[ed] . . . suicidal thoughts . . . [a]lmost every day." Defendant faced the possibility of being incarcerated for decades more over the next twenty-one months during which this case was pending, and during which the State was indifferent to and lacked diligence in bringing the case to trial. Thus, the evidence presented to the district court identified the types of disruptions and hardships that can be weighed in Defendant's favor. The district court was in the best position to assess the credibility of the witnesses and determine the severity of the hardships and anxiety suffered by Defendant during the additional twelve-month period after the speedy trial threshold had passed. *See Spearman*, 2012-NMSC-023, ¶ 19. Based upon the sufficiency of the evidence presented to show that Defendant suffered undue prejudice and the lack of evidence presented by the State showing that Defendant was not unduly prejudiced,

24

we will not substitute the State's view of the severity of Defendant's personal hardships and anxiety level for that of the district court. *See id.* (recognizing the deference given to factual findings by the district court). Under these circumstances, we agree with the district court that the prejudice factor weighed in Defendant's favor, and we further conclude that it should be weighed slightly to moderately in his favor.

## C. Balancing the Factors

{34} We weigh the length of delay and the reasons for the delay moderately to heavily in Defendant's favor. We weigh the assertion factor and the prejudice suffered slightly to moderately in Defendant's favor. None of the factors weigh in the State's favor. Therefore, we conclude that, on balance, the *Barker* factors weigh in Defendant's favor, and the district court appropriately dismissed Defendant's charges on speedy trial grounds. *See Spearman*, 2012-NMSC-023, ¶ 17.

## CONCLUSION

{35} We affirm the district court's order dismissing this case with prejudice.

{36} **IT IS SO ORDERED.**

_____

**TIMOTHY L. GARCIA, Judge**

**WE CONCUR:**

_____
**JONATHAN B. SUTIN, Judge**


_____
**M. MONICA ZAMORA, Judge**