This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-37592**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**JOSHUA D. ROMERO,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
**Fred T. Van Soelen, District Judge**

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Gregory B. Dawkins, Assistant Appellate Defender
Santa Fe, NM

for Appellant

### MEMORANDUM OPINION

**MEDINA, Judge.**

**{1}** Defendant Joshua Romero appeals his convictions for first-degree kidnapping, in violation of NMSA 1978, Section 30-4-1(A) (2003); two counts of felony aggravated battery against a household member, in violation of NMSA 1978, Section 30-3-16(C) (2018); interference with communications, in violation of NMSA 1978, Section 30-12-1 (1979); misdemeanor aggravated battery against a household member, in violation of Section 30-3-16(B); resisting, evading, or obstructing an officer, in violation of NMSA 1978, Section 30-22-1(B) (1981); and intimidation of a witness, in violation of NMSA

1978, Section 30-24-3(A)(2) (1997). Defendant raises four issues. First, he argues that the evidence was insufficient to support his kidnapping conviction. Second, he claims that his convictions for felony and misdemeanor aggravated battery against a household member violate double jeopardy. Third, he contends his right to a speedy trial was violated. Fourth, he argues that the district court abused its discretion in allowing the State to cross-examine him about his "jail calls." We affirm.

**BACKGROUND**

{2}    Around 2:00 a.m., Victim awoke to banging on her front door and heard Defendant—her boyfriend at the time—screaming her name. Victim thought Defendant might be hurt so she opened the door, at which point Defendant began punching her in the face and telling her she was going to die. Defendant then demanded Victim's phone because he "didn't need anything to . . . interfere with him killing [Victim]." Although she knew her phone was underneath a pillow in her bedroom, she didn't want Defendant to find her phone because she knew she would need it to call for help. Defendant pushed Victim through the house as Victim pretended to look for her phone. Victim tried to flee from Defendant and ran toward the front door. However, just as she had one foot out the door Defendant grabbed Victim by her hair, pulled her back into the house, and slammed her on the floor—knocking the air out of her.

{3}    Defendant got on top of Victim and began hitting and kicking her in the face and ribs, telling her she was going to die and that she "messed up by trying to leave the house." Defendant then pulled Victim up by her hair and pushed her through her house to her bedroom. Once there, Defendant pushed Victim on her bed and told her she had thirty seconds to get her phone. Defendant pushed Victim back down each time she tried getting off the bed. Unbeknownst to Defendant, Victim reached under her pillow and held down the power button and automatically called 911. While Victim was holding the power button on the phone, Defendant retrieved some pens from the nightstand, and began stabbing Victim in her face.

{4}    Victim was unable to speak with the 911 operator. However the 911 operator returned Victim's phone call causing it to vibrate. Defendant heard Victim's phone vibrating, grabbed it and threw it at Victim's face. Defendant then threw the phone on the floor and "stomped" on it. Defendant then left the room with the phone to hide it and threatened to kill Victim if she tried to leave. As soon as Defendant left the room, Victim tried to run out the back door. However, Defendant grabbed Victim by her hair, pulled her back into the room and told her she could not leave and that he was going to kill her. Defendant put Victim on the bed, got on top of her, and began telling her how stupid she was.

{5}    Defendant began choking Victim with his hands, telling her they were "going to play a game" and that "two minutes [without] air would [cause] brain damage and four minutes [without air] would leave [Victim] . . . brain dead." Victim passed out twice while being choked. After Victim regained consciousness the second time, Defendant threatened Victim that he would kill her the next time he strangled her. Defendant then

grabbed a laptop charger cord from the side of her bed and began choking her with the cord. Victim passed out again. When she regained consciousness, Defendant warned Victim not to tell anyone about the incident and told her to go to sleep. Defendant laid down next to Victim and eventually fell asleep, at which point Victim escaped.

## DISCUSSION

### I.        Sufficiency of the Evidence

**{6}**        Defendant argues that there was insufficient evidence to support his kidnapping conviction because his restraint of Victim was incidental to the batteries. "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Montoya*, 2015-NMSC-010, ¶ 52, 345 P.3d 1056 (internal quotation marks and citation omitted). "[S]ubstantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]" *State v. Salgado*, 1999-NMSC-008, ¶ 25, 126 N.M. 691, 974 P.2d 661 (internal quotation marks and citation omitted). We "view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176.  To determine whether substantial evidence exists, we measure the evidence against the instructions submitted to the jury. *State v. Smith*, 1986-NMCA-089, ¶ 7, 104 N.M. 729, 726 P.2d 883 ("Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured.").

**{7}**        We limit our sufficiency review to the element of restraint, as it is the only element of kidnapping challenged on appeal. In *State v. Trujillo*, this Court held that movement or restraint that is incidental to the commission of a different crime may not also be punished as kidnapping. 2012-NMCA-112, ¶¶ 6-8, 289 P.3d 238. Whether the restraint is incidental presents a fact question that is to be evaluated based on the totality of the circumstances. *Id.* ¶¶ 42-43.

> This inquiry includes consideration of [(1)] whether the restraint was longer or greater than necessary to commit the other crime, [(2)] whether the restraint decreased the defendant's risk of detection or the difficulty associated with committing the crime, and [(3)] whether the restraint increased the risk of harm or the severity of the assault beyond that inherent to the underlying crime.

*State v. Garcia*, 2019-NMCA-056, ¶ 19, 450 P.3d 418. The question is "whether the restraint or movement increases the culpability of the defendant over and above his culpability for the other crime." *Trujillo*, 2012-NMCA-112, ¶ 38.

**{8}**        Here, the restraint underlying Defendant's kidnapping conviction was his initial act of "grabbing [Victim] by the hair and dragging her into the house and/or holding her

down on the bed[,]" whereas the conduct underlying Defendant's three battery convictions were his acts of: (1) choking Victim with his hands, (2) choking Victim with the laptop cord, and (3) punching and kicking Victim. Relying on *Trujillo*, Defendant claims the restraint underlying his kidnapping conviction was incidental to the batteries because the restraint took place during the commission of the batteries, in the same general location, and did not substantially elevate the risk of harm to Victim. We are not persuaded by Defendant's reliance on *Trujillo* for several reasons.

{9}     First, Defendant's restraint of Victim was "longer or greater than necessary to commit the [battery charges.]" *Garcia*, 2019-NMCA-056, ¶ 19. Unlike *Trujillo*, where the incident lasted two to four minutes, 2012-NMCA-112 ¶ 3, Victim testified that Defendant confined her in the house for about an hour—much longer than necessary to commit the batteries. *See Garcia*, 2019-NMCA-056, ¶ 20 (concluding the victim's confinement in a shed was "slightly longer than necessary to commit the sexual assault, as [the d]efendant took time to close the shed door and utter a menacing statement to [the v]ictim").

{10}     Second, Defendant's pulling of Victim back into the house undoubtedly "decreased [his] risk of detection or the difficulty associated with committing the crime," *id.* ¶ 19, as it prevented her from escaping and alerting authorities. *Cf. Trujillo*, 2012-NMCA-112, ¶ 42 (noting that "if the [v]ictim had been restrained and under restraint moved outside his home, we would have a more complicated and closer question"). Lastly, Defendant's act of pulling Victim back into the house "increased the risk of harm or the severity of the assault beyond that inherent to the [battery charges.]" *Garcia*, 2019-NMCA-056, ¶ 19. When Victim first tried to escape, Defendant pulled her back into the house by her hair and slammed her on the floor with such force it knocked the air out of her. Unlike the "momentary grab in the middle of a fight" which did not appear to otherwise harm the victim in *Trujillo*, Defendant's attack went well beyond that inherent in the subsequent batteries. *Cf.* 2012-NMCA-112, ¶¶ 3, 6, 39 (concluding that the "brief restraint . . . was not an effort to increase the harm to [the v]ictim").

{11}     Given the foregoing, we conclude Defendant's conduct underlying his kidnapping conviction increased his culpability "over and above his culpability for the [battery charges]." *Id.* ¶ 38; *see Garcia*, 2019-NMCA-056, ¶ 23 (noting that "[t]his case, unlike *Trujillo* . . . , presents a more nuanced set of facts in which [the d]efendant not only restrained [the v]ictim during the sexual assault, *but also thwarted her attempt to escape*" and concluding that "there is sufficient evidence of restraint and confinement, independent from the restraint used during the sexual assault, to support [the d]efendant's kidnapping conviction" (emphasis added)).

{12}     Finally, to the extent Defendant points out, the crimes all occurred in Victim's house, this fact, alone, is not dispositive. *See Trujillo*, 2012-NMCA-112, ¶ 43 ("[W]hether the restraint or movement is incidental depends on the facts of each case, in light of the totality of surrounding circumstances. This characterization is as much a consideration of the relation between the restraint and the other crime as it is a measure of the precise distance moved or place held." (alteration, internal quotation marks, and citation

omitted)). In light of the totality of the surrounding circumstances, we conclude sufficient evidence supported Defendant's kidnapping conviction.

## II.      Double Jeopardy

**{13}**    Defendant claims his convictions for misdemeanor battery and two counts of aggravated battery against a household member violate double jeopardy. We disagree. Double jeopardy protects against multiple punishments for the same offense. *Swafford v. State*, 1991-NMSC-043, ¶¶ 7-8, 112 N.M. 3, 810 P.2d 1223. Appellate courts "generally review double jeopardy claims de novo." *State v. Rodriguez*, 2006-NMSC-018, ¶ 3, 139 N.M. 450, 134 P.3d 737. "However, where factual issues are intertwined with the double jeopardy analysis, we review the [district] court's fact determinations under a deferential substantial evidence standard of review." *Id.*

**{14}**    "Multiple punishment problems can arise from both 'double-description' claims, in which a single act results in multiple charges under different criminal statutes, and 'unit-of-prosecution' claims, in which an individual is convicted of multiple violations of the same criminal statute." *State v. Bernal*, 2006-NMSC-050, ¶ 7, 140 N.M. 644, 146 P.3d 289. Regardless of how we characterize Defendant's double jeopardy challenge—which involves two felony convictions under Section 30-3-16(C) and one misdemeanor conviction under Section 30-3-16(B)—the outcome turns on whether Defendant's conduct underlying both offenses is unitary and requires us to conduct "a substantially similar analysis" under the double-description and unit-of-prosecution inquiries. *Bernal*, 2006-NMSC-050, ¶ 16 (noting that double-description cases have adopted *Herron v. State*, 1991-NMSC-012, 111 N.M. 357, 805 P.2d 624, factors from the unit-of-prosecution cases for purposes of determining whether a defendant's conduct was unitary).

**{15}**    "In each case, we attempt to determine, based upon the specific facts of each case, whether a defendant's activity is better characterized as one unitary act, or multiple, distinct acts, consistent with legislative intent." *Bernal*, 2006-NMSC-050, ¶ 16. "Conduct is non-unitary if sufficient indicia of distinctness separate the illegal acts." *State v. Armendariz*, 2006-NMCA-152, ¶ 7, 140 N.M. 712, 148 P.3d 798 (internal quotation marks and citation omitted). In conducting our analysis, we look to factors adopted by our Supreme Court in *Herron*, 1991-NMSC-012, ¶ 15. In particular, we examine the "(1) temporal proximity of the acts; (2) location of the victim during each act; (3) existence of an intervening act; (4) sequencing of the acts; (5) the defendant's intent as evidenced by his conduct and utterances; and (6) the number of victims." *State v. Garcia*, 2009-NMCA-107, ¶ 10, 147 N.M. 150, 217 P.3d 1048 (citing *Herron*, 1991-NMSC-012, ¶ 15).

**{16}**    Defendant was convicted of one count of felony aggravated battery against a household member for choking Victim with his hands and another count for choking Victim with the laptop cord. Defendant was convicted of misdemeanor aggravated battery against a household member for "punching and/or kicking [Victim]." Defendant argues there was insufficient indicia of distinctness separating the battery convictions

because the batteries "occurred at the same time, to achieve the same result, and in the same place." We disagree.

**{17}** First, in regard to Defendant's misdemeanor conviction, Victim testified that Defendant began punching her in the face as soon as she opened the front door. He also hit and kicked Victim in her face and ribs after she first tried to escape. Both of these acts occurred at the beginning of the approximately one-hour long attack and before Defendant pushed Victim to her bedroom. Further separating this conduct from the conduct underlying the felony battery convictions was, among other things, Defendant's acts of: stabbing Victim with the pens, hitting Victim with the phone, and hiding the phone in another room. These intervening acts, coupled with the change in location and separation of time, constitute sufficient indicia of distinctness separating Defendant's misdemeanor conviction from his felony convictions. *Cf. State v. Wilson*, 1993-NMCA-074, ¶ 9, 117 N.M. 11, 868 P.2d 656 (holding that the defendant's acts of forcing the victim to engage in fellatio were separate and distinct because the defendant moved the victim to another room and an intervening event took place between the two acts).

**{18}** Turning to Defendant's felony convictions, Victim testified Defendant first choked her with his hands, telling her they were "going to play a game" where Defendant would choke Victim in an attempt to cause her brain damage. Defendant caused Victim to pass out twice. When Victim regained consciousness the second time, Defendant told her he would let her change clothes and fix her hair and makeup so she would look "half-way decent" when they found her body because he was going to kill her the next time he choked her. When Victim declined to do so and begged for her life, Defendant told Victim he was going to put her in his trunk and bury her where no one would find her. He also told Victim he would not make the mistake of leaving any witnesses, and that if he was going to go back to prison, it would be for murder, not domestic violence. It was not until after making these threats that Defendant got the laptop cord from the side of the bed and strangled Victim with it.

**{19}** Although the strangulations took place in the same location, no single factor is determinative. *See Herron*, 1991-NMSC-012, ¶ 15 (stating, in relevant part, that "none of these factors alone is a panacea"). Defendant's threats and act of retrieving and using another object to perpetrate the choking constituted intervening acts, as well as evidence of Defendant's change in intent to kill Victim with the cord (as opposed to his earlier intent to cause brain damage with his hands). And while it is unclear how much time passed between the strangulations, there was at least enough time for Defendant to make his threats and retrieve the laptop cord. In light of the forgoing, sufficient indicia of distinctness separated the conduct underlying Defendant's two felony convictions.

**{20}** We are not persuaded by Defendant's reliance on *Garcia*, or *State v. Mares*, 1991-NMCA-052, 112 N .M. 193, 812 P.2d 1341. *Garcia*, involved a fight between two inmates in the same cell and the batteries occurred close in time and without intervening events or the use of a different weapon. *See* 2009-NMCA-107, ¶¶ 2-4, 13-15. In the present, as discussed above, Defendant's batteries of Victim were separated

from each other by intervening acts, time, space, and/or an evidence of change in intent. And unlike *Mares*, where this Court perceived no distinct break in the battery upon the victim and no qualitative difference between the defendant's acts of force given the victim's vague testimony, Victim's testimony was sufficiently detailed to demonstrate the existence of sufficient indicia of distinctness underlying each of the batteries. *See* 1991-NMCA-052, ¶¶ 2-4, 26-27. Consequently, we conclude Defendant's convictions for misdemeanor and aggravated battery against a household member do not violate double jeopardy. *See Armendariz*, 2006-NMCA-152, ¶ 6 ("If the conduct is non-unitary, multiple punishments do not violate the Double Jeopardy Clause, and our analysis ends.").

## III.    Speedy Trial

**{21}**    Defendant contends his constitutional right to a speedy trial was violated. "The right of the accused to a speedy trial is guaranteed by both the Sixth Amendment of the United States Constitution and Article II, Section 14 of the New Mexico Constitution." *State v. Spearman*, 2012-NMSC-023, ¶ 16, 283 P.3d 272. When determining whether a defendant has been deprived of the right to a speedy trial, we examine the four factors identified in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of delay in bringing the case to trial, (2) the reasons for the delay, (3) the defendant's assertion of the right to a speedy trial, and (4) the prejudice to the defendant caused by the delay." *State v. Serros*, 2016-NMSC-008, ¶ 5, 366 P.3d 1121. "In analyzing these factors, we defer to the district court's factual findings concerning each factor as long as they are supported by substantial evidence, we independently review the record to determine whether a defendant was denied his speedy trial right, and we weigh and balance the *Barker* factors de novo." *State v. Montoya*, 2015-NMCA-056, ¶ 12, 348 P.3d 1057.

**{22}**    "The first factor, the length of delay, has a dual function: it acts as a triggering mechanism for considering the four *Barker* factors if the delay crosses the threshold of being presumptively prejudicial, and it is an independent factor to consider in evaluating whether a speedy trial violation has occurred." *Serros*, 2016-NMSC-008, ¶ 22 (internal quotation marks and citation omitted). Our Supreme Court has established benchmarks for presumptively prejudicial delay according to the complexity of a case: twelve months for a simple case, fifteen months for a case of intermediate complexity, and eighteen months for a complex case. *State v. Garza*, 2009-NMSC-038, ¶¶ 47-48, 146 N.M. 499, 212 P.3d 387. The weight we assign this factor varies with the length of the delay: "[a]s the delay lengthens, it weighs increasingly in favor of the accused." *State v. Ochoa*, 2017-NMSC-031, ¶ 14, 406 P.3d 505.

**{23}**    Defendant's speedy trial right attached when he was arrested on July 16, 2016. *See State v. Fierro*, 2014-NMCA-004, ¶ 8, 315 P.3d 319 ("The speedy trial right attaches when the defendant becomes an accused, that is, by a filing of a formal indictment or information or arrest and holding to answer." (internal quotation marks and citation omitted)). Defendant's jury trial began on April 27, 2018—approximately twenty-one months after he was arrested.

**{24}** The parties agree that this was a simple case, and the district court accepted this concession despite noting it was more "involved" because it required "a lot" of witnesses. Given the State's concession, and given that the determination of the case's complexity (i.e., simple versus intermediate) does not change the outcome, we accept the State's concession that this is a simple case. *See State v. White*, 1994-NMCA-084, ¶ 2, 118 N.M. 225, 880 P.2d 322 (accepting parties' contention that the case was simple). Accordingly, the twenty-one month delay in this simple case triggers a consideration of the four *Barker* factors. *See Garza*, 2009-NMSC-038, ¶ 48.

**{25}** The district court did not make any findings in terms of the weight given to the length of delay. Defendant argues the length of delay should weigh "somewhat heavily" against the State, because the delay exceeded the presumptive prejudicial delay by nine months. Defendant relies on *Zurla v. State*, in which our Supreme Court found a total delay of seventeen months in a simple case involving a single count of misdemeanor shoplifting weighed "somewhat heavily" against the state. 1990-NMSC-011, ¶¶ 1, 11, 109 N.M. 640, 789 P.2d 588, *holding modified on other grounds by Garza*, 2009-NMSC-038, ¶¶ 16, 22. The present case, however, involved seven felony and misdemeanor counts and "a lot" of witnesses, thus requiring significantly more time to prepare for trial. We are therefore unpersuaded that the delay in Defendant's case should weigh "somewhat heavily" against the State.

**{26}** The State, on the other hand, argues that the length of delay should only weigh slightly against the State. The State relies on *State v. Montoya*, in which this Court found the total length of delay of twenty-one months "was not so long or protracted as to weigh more than slightly against the [s]tate." 2011-NMCA-074, ¶ 17, 150 N.M. 415, 259 P.3d 820. However, the length of delay in *Montoya* was only six months beyond the presumptive period for an intermediate case, *id.* ¶¶ 16-17, whereas the length of delay in this case was nine months past the presumptive period for a simple case. We conclude the length of delay should weigh moderately against the State. *See State v. Suskiewich*, 2016-NMCA-004, ¶ 8, 363 P.3d 1247 (weighing nine-month delay beyond the presumptive period moderately against the state). *Compare Montoya*, 2011-NMCA-074, ¶ 17 (weighing six-month delay beyond the presumptive period moderately to slightly against the state), *with Montoya*, 2015-NMCA-056, ¶ 15, (weighing twelve-month delay beyond the presumptive period "moderately to heavily" against the state).

**{27}** Although we typically analyze the prejudice factor last, we turn to this factor next because it is dispositive. The final *Barker* factor is "[t]he heart of the speedy trial right" *State v. Lujan*, 2015-NMCA-032, ¶ 20, 345 P.3d 1103 (internal quotation marks and citation omitted), and requires us to look at the prejudice suffered by the defendant as a result of the delay. *See Ochoa*, 2017-NMSC-031, ¶ 48. This analysis focuses on three main interests sought to be protected by the speedy trial right: "[(1)] preventing oppressive pretrial incarceration, [(2)] minimizing anxiety and concern of the accused, and [(3)] limiting the possibility that the defense will be impaired." *Id.*

**{28}** "As to the first two types of prejudice, some degree of oppression and anxiety is inherent for every defendant who is jailed while awaiting trial. Therefore we weigh this

factor in the defendant's favor only where the pretrial incarceration or the anxiety suffered is undue." *Garza*, 2009-NMSC-038, ¶ 35 (alterations, internal quotation marks, and citation omitted). "The third type of prejudice is the most serious." *Id.* ¶ 36 (internal quotation marks and citation omitted). Generally, it is a defendant's burden to "make a particularized showing of prejudice to demonstrate a violation of any of the three interests." *State v. Samora*, 2016-NMSC-031, ¶ 21, 387 P.3d 230.

**{29}** Regarding the first two types of prejudice, it is undisputed Defendant spent the entire period incarcerated. Defendant claims he "lost valuable time with his daughters" and "further lost relationships with family and friends, his job, home[,] and all of his personal belongings." Defendant, however, fails to support these assertions with any evidence in the record. Although we may presume some prejudice from Defendant's incarceration, *see Ochoa*, 2017-NMSC-031, ¶ 57 (presuming some prejudice by reason only of the defendant's two-year, continuous incarceration), "absent affirmative proof, we can only speculate as to the specific circumstances of his incarceration," and "[i]n the absence of such proof, this factor does not tip the scale in [the d]efendant's favor." *Id.* ¶¶ 60, 64. As to the third type of prejudice, Defendant concedes that his defense was "not appreciably impaired by the delay." Consequently, Defendant fails to demonstrate any particularized prejudice that he suffered as a result of the delay in this case. *See Suskiewich*, 2016-NMCA-004, ¶¶ 2, 30 (determining that the defendant failed to make a particularized showing of prejudice despite being incarcerated for more than twenty-four months before trial).

**{30}** As Defendant fails to show actual prejudice, the three other *Barker* factors must weigh heavily against the State in order to establish a speedy trial violation. *See Samora*, 2016-NMSC-031, ¶ 23 ("To find a speedy trial violation without a showing of actual prejudice, the Court must find that the three other *Barker* factors weigh heavily against the [s]tate."). Given that the first *Barker* factor—the length of the delay—does not weigh more than moderately against the State, we need not consider the remaining *Barker* factors. We, therefore, conclude that Defendant's right to a speedy trial was not violated and affirm the district court's denial of Defendant's speedy trial motion.

## IV. Evidence of Defendant's Calls From Jail

**{31}** Defendant's final argument concerns the State's questioning of Defendant at trial about calls he made to Victim from jail. Specifically, Defendant contends the district court abused its discretion in allowing the State to question Defendant about the content of his conversations with Victim because it violated the parties' pretrial agreement. *See State v. Dickert*, 2012-NMCA-004, ¶ 44, 268 P.3d 515 ("We review claims that a trial court erred in admitting evidence for abuse of discretion." (internal quotation marks and citation omitted)). For reasons we explain, we reject Defendant's argument.

**{32}** Prior to trial, the parties agreed that the State would not seek to introduce the contents of telephone calls made between Defendant and Victim while Defendant was in jail. When Defendant took the stand, the State asked him, "How many times have you attempted to contact [Victim] over the last couple of years and tried to tell her to not

testify?" Defense counsel objected to the question before Defendant could answer on the basis that Defendant's jail calls were overly prejudicial, and the State's question violated the pre-trial agreement. The district court told the State to get a yes or no answer to its question and move on. The State then asked Defendant, "Have you made any attempts or anybody that you know made any attempts to contact [Victim] since this incident?" When Defendant admitted he had called Victim, the State asked how many times, to which Defendant replied "four or five times." The State then moved on to another subject.

{33}   Having considered Defendant's claim in light of the record, we fail to see how the State's questioning was improper. The State never mentioned any jail calls or their content. Moreover, aside from arguing that his conviction for intimidation of a witness should be reversed because "[t]his evidence was the only evidence that could have given rise to the [conviction,]" Defendant fails to explain how it constituted reversible error. *See State v. Jett*, 1991-NMSC-011, ¶ 8, 111 N.M. 309, 805 P.2d 78 ("An evidentiary ruling within the discretion of the court will constitute reversible error only upon a showing of an abuse of discretion, and a demonstration that the error was prejudicial rather than harmless[.]" (citations omitted)). Contrary to Defendant's assertion, this was not the only evidence supporting the charge of intimidation of a witness: Victim testified that when she regained consciousness after being choked with the laptop cord, Defendant told her that "it wouldn't be good for [her]" if she tried to tell anyone about the incident, and Defendant "would make sure [Victim] never felt safe again" if he went to jail. Therefore, we decline to address Defendant's argument any further. *See Dickert*, 2012-NMCA-004, ¶ 46 (declining to address the defendant's argument that the district court erred in admitting certain photographic evidence at trial when the defendant failed to identify the remedy he sought and made no attempt to prove that the admission prejudiced him or constituted reversible error).

**CONCLUSION**

{34}   For the foregoing reasons, we affirm.

{35}   **IT IS SO ORDERED.**

**JACQUELINE R. MEDINA, Judge**

**WE CONCUR:**

**LINDA M. VANZI, Judge**

**BRIANA H. ZAMORA, Judge**